IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMES W. CHANEY, JR.                                    PLAINTIFF

        v.                   Civil No.  5:14-cv-05352-TLB-MEF

SHERIFF KELLEY CRADDUCK;
SERGEANT COGBILL; LIEUTENANT
J. MARTINEZ; LIEUTENANT DEVORE;
DR. ROBERTO SAEZ, Southern Health Partners;
NURSE AMBER GOFF, Southern Health
Partners; JOHN DOE DEPUTY; CATERING
BY MARLINS, d/b/a CBM Managed Services;
and NURSE TYRANNY RAY                                   DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

        This is a civil rights action filed by the Plaintiff, James W. Chaney, Jr., pursuant to 42

U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis* (IFP).

        When Plaintiff filed this case, he was incarcerated in the Benton County Detention Center

(BCDC).  Plaintiff is now incarcerated in the Arkansas Department of Correction (ADC), North

Central Unit.  While at the BCDC, Plaintiff contends his constitutional rights were violated in

a number of ways.

        With respect to the Benton County Defendants, Sheriff Cradduck, Sergeant Cogbill,

Lieutenant J. Martinez, and Lieutenant Devore, he maintains that: excessive force was used

against him; Sheriff Cradduck and Lieutenant Martinez did nothing to correct the wrong;

Sergeant Cogbill displayed unprofessional conduct and nothing was done to correct his behavior;

Lieutenant Devore did nothing to correct Cogbill's behavior;  prisoners were given insufficient

cleaning supplies; and, Defendant initially refused to complete his certificate of account so he

could submit it with his IFP application.  With respect to the Medical Defendants, Dr. Roberto

-1-

Saez, Nurse Amber Goff, and Nurse Tyranny Ray, Plaintiff maintains they denied him adequate medical care.  Finally, with respect to Catering by Marlins (CBM), Plaintiff maintains that his medically prescribed soft diet frequently contained food items he could not eat because the foods were too hard.

The case is before me on three Motions for Summary Judgment: a Motion for Summary Judgment filed by the Benton County Defendants (Docs. 56-58); a Motion for Summary Judgment filed by the Medical Defendants (Docs. 53-55); and, a Motion for Summary Judgment filed by CBM (Docs. 50-52).  A hearing was held on March 15, 2016, to allow Plaintiff to testify in response to the Motions.  Plaintiff appeared by video and had no exhibits to offer.  The Motions are ready for decision.

## I.  Background

Plaintiff was booked into the BCDC on April 23, 2014.  *CBM Ex.* A at 86.  He remained there until April 8, 2015, when he was transferred to the ADC.  *Id.*

With respect to the Benton County Defendants, Plaintiff testified that Sergeant Cogdill had "issues with my hernia."  *CBM Ex.* A at 30.  Plaintiff indicated he developed a hernia in 2003 or 2004.  *Id.* at 31.  Plaintiff testified that in August of 2014, he started having trouble going to the restroom, could not stand up straight, and was in serious pain.  *Id.* at 31-32.  On August 11, 2014, he submitted a request noting that he had been told he was on the list to talk to the doctor about his inguinal hernia.  *BCDC Defts' Ex.* A at 76.[1]  He was told he was on the list.  *Id.*  In a request dated August 14, Plaintiff stated he had been seen by the doctor the prior

---

[1] Page references to this exhibit are to the jail file number contained at the bottom center of the page.

day but that the doctor said he could not feel a hernia.  *Id.* at 79.  He submitted multiple requests

on August 14 regarding his hernia.  *Id.* at 80-83.

Plaintiff testified that on August 14, 2014, he was laying and in his bed "cryin', hurtin',

all bundled - doubled over in pain."  *CBM Ex.* B at 33 & 40.  Sergeant Cogdill came into the pod

and said: "We have to agree, before I let you see the nurse, that what we're dealing with is some

kind of other gastrointestinal issue and not a hernia."  *Id.* at 33.  Sergeant Cogdill claimed to be

looking at Plaintiff's medical records on his phone and said the records indicated Plaintiff did

not have a hernia.  *Id.* at 34.  Plaintiff stated he had told Sergeant Cogdill that his hernia was

hurting.  *Id.*  Plaintiff testified that Sergeant Cogdill "told me that the way we should handle is -

he said - he said I should go to the shower and rub one out."  *Id.* at 35.  Plaintiff took this to mean

he should masturbate.  *Id.*  Plaintiff stated that the other inmates heard this as well as a nurse

who was at the door.  *Id.*  Plaintiff testified this messed him up "mentally a lot."  *Id.* at 37.

Plaintiff maintains Sergeant Cogdill's actions prolonged his pain.  *CBM Ex.* at 34.  After

Plaintiff agreed with Sergeant Cogdill, Plaintiff was seen by the nurse.  *Id.*  Plaintiff states this

resulted in a delay of ten to fifteen minutes in having the nurse come and see him.  *Id.* at 84.

During this time, Plaintiff states he suffered unnecessary pain.  *Id.* at 34.

Plaintiff was seen by the nurse and given some medication to help him sleep.  The

following day, he was taken to the hospital.  *BCDC Defts' Ex.* A-1 at 77.  He was given

Ibuprofen and Colace[2] in the meantime.

Plaintiff submitted two grievances about Sergeant Cogdill's actions.  *CBM Ex.* A, *Depo.*

*Ex.* 1.  Lieutenant Devore responded that he would forward the grievance to his Lieutenant.

---

[2] Colace is a brand name for a stool softener.  https://medlineplus.gov/druginfo/meds/a601113.html (accessed July 14, 2016).

-3-

*CBM Ex.* A at 41.  Plaintiff was satisfied by the response initially.  *Id.*  He does not believe, however, that any action was ever taken in response to the grievance.  *Id.* at 41-44.

Plaintiff believes his complaint against Sergeant Cogdill is what got him moved out of H- pod.  *CBM Ex.* A at 42.  He recalled seeing somewhere in the paperwork he got in this lawsuit that the move was "per" Sergeant Cogdill.  *Id.*  Specifically, he recalled seeing something that said: "Not to be housed in H-Pod per Sergeant Cogdill and Lieutenant Martinez, or Devore, or somebody."  *Id.*  Plaintiff, however, indicated H-pod was overcrowded.  *Id.*

Prior to his being transported to the hospital, Plaintiff testified he overheard a conversation where they were talking about Plaintiff having filed a grievance on Sergeant Cogdill.  *CBM Ex.* A at 42-43.  Specifically, someone said to be careful around the Plaintiff because he likes to "file grievances on us."  *Id.* at 43.  Plaintiff indicates Corporal Garrett was a little snotty or rude toward him.  *Id.*

With respect to Lieutenant Devore, Plaintiff states he failed to take appropriate action in response to his grievance about Sergeant Cogdill.  *CBM Ex.* A at 44.  At a minimum, Plaintiff believes Sergeant Cogdill should have been reprimanded.  *Id.* at 44.  Plaintiff agreed that he did not know if Sergeant Cogdill was reprimanded and probably would not know.  *Id.*  Plaintiff believes Sergeant Cogdill's comment was sexual in nature.  *Id.* at 45.

Plaintiff's other claim against Lieutenant Devore concerned cleaning supplies.  *CBM Ex.* A at 45.  He later determined, however, that Lieutenant Devore had nothing to do with cleaning supplies.  *Id.* at 59.

With respect to Lieutenant Martinez, Plaintiff indicates he believes he was Sergeant Cogdill's supervisor.  *CBM Ex.* A at 59.  Additionally, Plaintiff asserts a claim against Lieutenant

-4-

Martinez arising out of the use of excessive force against the Plaintiff during a shakedown on October 1, 2014. *Id.* at 60. Plaintiff did know the identity of the guard because Plaintiff was face down on the floor. *Id.* Plaintiff believes Lieutenant Martinez should have reviewed the video footage and figured out who the deputy was. *Id.* at 61.

Plaintiff filed a grievance about this incident saying he was "shoved face first into the floor, stepped on, and had his hernia smashed into the floor." *CBM Ex.* A, *Depo. Ex.* 3. Lieutenant Martinez responded by asking who the deputy was and how Plaintiff's hernia was smashed onto the floor. *Id.* Plaintiff responded by saying he did not know who the deputy was. *CBM Ex.* A at 62. Plaintiff's claim is based on the failure to discover the deputy's identity and reprimand him. *Id.* at 64-65. After this, Plaintiff testified his hernia "wouldn't go back inside," and he was scheduled for surgery. *Id.* at 75.

On October 1, 2014, Plaintiff submitted three requests about items missing from his cell after the shakedown. *BCDC Defts' Ex.* A-1 at 106. He does not mention any injury in these requests. *Id.* Lieutenant Devore in response tells Plaintiff to talk to Sergeant Dewey. *Id.* The following day, Plaintiff submitted a request stating that he was "stepped on yesterday by a deputy[3] during a shakedown and I have been in pain in my hernia" since then and would like to see a nurse. *Id.* at 107. Nurse Ray, responded three days later by writing "seen." *Id.*

On October 3, 2014, Plaintiff submitted a request stating he could not identify the deputy and he was "on my stomach on the floor and the officer stepped on or kneeled on the backside it smashed my hernia into the floor and I have been in pain since." *BCDC Defts' Ex.* A-1 at 109. Lieutenant Devore responded that day advising the Plaintiff to see the medical staff. *Id.* Plaintiff

---

[3] This deputy is still listed as a John Doe Defendant. The parties have been unable to identify him.

also submitted that day two requests about property that he maintains was taken during the shakedown. *Id.* at 110-111. Plaintiff submitted another request on October 15, 2014, about the missing property, and then a request on October 18, 2014, to speak with Sergeant Dewey about it. *Id.* at 116 & 118.

With respect to the alleged unconstitutional conditions of confinement, Plaintiff testified that Defendants failed to maintain a clean and safe environment. While they are given sanitizer to use in cleaning the cell area, Plaintiff stated there were three separate occasions when inmates were getting staph infection. Additionally, he notes that the water in the mop bucket they are given to use has to be used for all cells despite how dirty the water gets.

Plaintiff submitted a number of grievances about cleaning supplies: (1) on October 28, 2014, he was "denied comet"; (2) on October 30, 2014, he was "refused comet and the sanitizer will not clean"; (3) November 5, 2014, he was "forced to clean with dirty stuff"; (4) November 6, 2014, he was "denied comet, dirty water, and being out of chemicals"; and, (5) on November 7, 2014, he was "denied comet." *BCDC Defts' Ex.* at 131A, 132A, 139, 139A, 139B, 139C.

Plaintiff testified he named the Sheriff as a Defendant because he is responsible for the running of the jail, maintaining order, making sure inmates are not abused, and making sure the cleaning supplies are there for the inmates' use. *CBM Ex.* A at 66. Plaintiff never spoke to Sheriff Cradduck. *Id.*

Plaintiff testified it was a custom of the jail employees to "do shakedowns - pick everybody up and throw 'em on the floor, and that's what they did on October 1st." *CBM Ex.* A at 71. He believes the employees are trained to come in and throw everyone on the floor. *Id.* According to Plaintiff, the jailers enter the pod, tell everyone to get on the floor, and if you don't

AO72A
(Rev. 8/82)

comply they throw you to the floor. *Id.* at 72. He testified there were no other policies, customs, or practices that was the moving force behind the violation of his constitutional rights. *Id.* at 78.

With respect to the Medical Defendants, Plaintiff first argues he received inadequate treatment following surgery on October 9, 2014, to repair an inguinal hernia. An inguinal hernia occurs "when the contents of the abdomen - usually fat or part of the small intestine - protrude through a weak area in the lower abdominal wall." *Med. Defts' Ex.* 2 at ¶ 4.

After his surgery, Plaintiff was given prescriptions for Colace, Oxycodone, Ibuprofen, and Acetaminophen. *Med. Defts' Ex.* 1 at ¶ 8. The Oxycodone prescription was for 5 mg - the lowest dose available. *Id.* at ¶ 9. Plaintiff received all prescribed medication except for the Oxycodone. *Id.* at ¶ 10. In place of the Oxycodone, Plaintiff testified he was given Ibuprofen and Acetaminophen.

Later in the day on October 9, 2014, Plaintiff was returned to the hospital for evaluation and treatment for vomiting. *Med. Defts' Exs.* 1 at ¶ 11 & 1-a. Plaintiff submitted a medical request on October 9 asking for an antibiotic because he was concerned about infection. *Med. Defts' Exs.* 1 at ¶12 & 1-d. He also complained of urination issues. *Med. Defts' Ex.* 1 at ¶ 13.

On October 10, 2014, Plaintiff submitted a request saying he was not receiving the pain medication he was prescribed at the hospital. *Med. Defts' Exs.* 1 at ¶ 14 & 1-e. According to Nurse Ray, Plaintiff was already receiving Acetaminophen 1000 mg. *Id. & Med. Defts' Ex.* 1-b.

On October 12, 2014, Plaintiff was given a prescription for an antibiotic, Ciprofloxacin, and Flomax to assist with the urine flow. *Med. Defts' Exs.* 1 at ¶¶ 18-19, 1-b & 2 at ¶ 6. On October 14, 2014, Plaintiff complained of discoloration of his testicles. *Med. Defts' Ex.* at 1-h. Nurse Goff explained that this was normal after the type of procedure he had. *Id.*

On October 18, 2014, Plaintiff submitted a request complaining about a painful lump in his surgical scar, pain, and trouble with urination. *Med. Defts' Exs.* 1 at ¶ 20 & 1-i. Plaintiff was seen at nurse call the following day. *Id.* Plaintiff made no further complains about his inguinal hernia surgery after October 18. *Id.* at ¶ 21.

Plaintiff received Ibuprofen 800 mg from October 11, 2014 until November 9, 2014. *Med. Defts' Ex.* ¶ 15. Plaintiff received Acetaminophen 1000 mg until October 19, 2014. *Id.* at ¶ 16.

Plaintiff testified he did not get supportive underwear. *CBM Ex.* A at 107. He was not moved to the bottom tier of the pod so he did not have to climb stairs. *Id.* He did not ask Dr. Saez or the nurses to give him an order for a bottom tier but believed his post-op instructions included an exercise restriction. *Id.* at 106-110. He believes, however, that the medical staff made the suggestion to detention staff that Plaintiff be moved to the bottom tier. *Id.* at 111. Detention staff were unable to move him and Plaintiff was advised he would have to stay on the top tier for the time being. *Id.*

Finally, he argues it was very painful and the Ibuprofen and Tylenol were not sufficient to deal with the pain. *CBM Ex.* A at 112. He asked Nurse Goff for more pain medication but his request was denied. *Id.* She told him movement was good for him. *Id.* He was told the BCDC did not allow narcotic painkillers. *Id.* at 113. His claim is that he was not given adequate pain medication. *Id.* at 114. He was in pain for seven or eight days following his surgery. *Id.*

Plaintiff testified that he has bad teeth from years of not taking care of his teeth. *CBM Ex.* A at 17. He has had abscesses. *Id.* He was diagnosed with TMJ (temporomandibular joint) while he was in the BCDC. *CBM Ex.* A at 17. He did not know how long he had TMJ, but he

-8-

noted his jaw had "popped" for the last two or three years.  *Id.* at 17-18.  It did not start becoming painful until he was in the county jail.  *Id.* at 18.  It got "really, really painful" in October or November of 2014.  *Id.*  It also caused him to be unable to chew his food.  *Id.*

Plaintiff made his first complaint of jaw pain on October 16, 2014.  *Med. Defts' Ex.* 1-j. The following day, he was seen at nurse call.  *Med. Defts' Ex.* 3 at ¶ 6.  On November 20, 2014, Plaintiff submitted a medical request complaining about his jaw popping.  *Med. Defts' Exs.* 1 at ¶ 22 & 1-k.  He was seen at nurse call and placed on Ibuprofen until November 30.  *Med. Defts' Ex.* 1 at ¶ 23.

On November 30, 2014, Plaintiff complained his jaw was still hurting.  *Med. Defts' Exs.* 1 at ¶ 24 & 1-l.  Plaintiff was advised by Nurse Ray that he should not take Ibuprofen on a daily basis because it was hard on the stomach.  *Med. Defts' Exs.* 1 at ¶ 25 & 1-l.  He was told he would "have to try and get through the pain."  *Med. Defts' Ex.* 1-l.  Plaintiff received Ibuprofen from December 8 to December 14, 2014.  *Med. Defts' Ex.* 1 at ¶ 26.

On December 17, 2014, he was prescribed Mobic.[4]  *Med. Defts' Exs.* 1 at ¶ 27 & 2at ¶ 9.  On December 23, 2014, Plaintiff submitted a request stating his jaw was still giving him issues.  *Med. Defts' Ex.* 1-n.  He was told he had already seen the doctor about this issue and was being treated for pain.  *Med. Defts' Exs.* 1 at ¶ 29 & 1-n.

On December 29, 2014, Plaintiff submitted a request stating his jaw was causing him issues with everyday functions.  *Med. Defts' Exs.* 1 at ¶ 30 & 1-o.  On December 30, 2014, he was told he was already being treated for this issue.  *Id.* at ¶ 31 & 1-o.  He was informed the TMJ

---

[4] Mobic is a brand name for the drug meloxicam.  Meloxicam is used to relieve pain, tenderness, swelling and stiffness.  https://medlineplus.gov/druginfo/meds/a601242.html (accessed July 14, 2016).

problem could be addressed only through surgery and that the BCDC would not pay for TMJ surgery. *CBM Ex.* A at 88 & 114.

On January 14, 2015, Plaintiff submitted a medical request complaining of pain in his jaw. *Med. Defts' Exs.* 1 at ¶ 32-1-p. On January 15, Plaintiff was asked by Nurse Ray if he would like to be placed on a soft diet since it was hard for him to chew. *Id.* at ¶ 33 & 1-p. Plaintiff responded that he believed a soft diet would help. *Id.* at 1-q.

On January 16, 2015, Plaintiff complained of ongoing pain and asked to be transferred to a facility where his TMJ would be treated. *Med. Defts' Exs.* 1 at ¶ 35 & 1-r. He said he was in "severe pain and suffering and am having headaches and abscessed teeth due to this problem." *Med. Defts' Ex.* 1-r. He was prescribed a soft food diet, Flexeril,[5] and continued on Mobic. *Med. Defts' Exs.* 1 at ¶¶ 34-36 & 2 at ¶ 11. At this time, Plaintiff testified he was asking for anything to deal with the pain in his jaw.

On February 5, 2015, Plaintiff submitted three requests about being denied adequate medical treatment. *BCDC Defts' Ex.* A-1 at 190. He said he was in pain on a daily basis. *Id.* Whitney Pennington replied "noted and addressed." *Id.*

Plaintiff submitted another request that same day specifically about his jaw and the pain he was in. *BCDC Defts' Ex.* A-1 at 192. He said he knew he could purchase Ibuprofen and Tylenol at the commissary but stated he was indigent. *Id.* Nurse Ray replied that he was on medication for this condition. *Id.*

He also submitted a request stating that he had been suffering for months from a serious medical condition he had been told only could be fixed through surgery. *BCDC Defts' Ex.* A-1

---

[5] Flexeril is a brand name for the drug cyclobenzaprine. It is a muscle relaxant. It is used to relax muscles and relieve pain and discomfort. https://medlineplus.gov/druginfo/meds/a682514.html (accessed July 14, 2016).

at 193.  He asked how long he would have to deal with the suffering.  *Id.*  In response, he was told the ADC decided who they wanted transferred and when.  *Id.*

On February 6, 2015, Plaintiff sought to clarify that he had already been told that medical could do no more at that facility.  *BCDC Defts' Ex.* A-1 at 195.  He said the "responsibility falls on the jail to get me adequate treatment or get me someplace that will help me."  *Id.*  Lieutenant Darner replied that contract medical was responsible for medical problems he had while in the facility and he should contact them.  *Id.*

On February 16, 2015, Plaintiff submitted a request saying that the ADC had approved a surgical consult but the jail doctor said he was not going to send him.  *BCDC Defts' Ex.* A-1 at 200.  In response, Nurse Ray said the ADC had approved him to see the jail doctor, and that he said the surgery was unnecessary.  *Id.*

Plaintiff believed Nurse Ray did not take care of getting ADC approval for a surgical consult regarding his TMJ.  *CBM Ex.* A at 115.  He testified, however, that the ADC has still not approved the surgery.  *Id.* at 116.

At the ADC, he had been on Meloxicam[6] and Robaxin[7], but he was taken off that and only given Ibuprofen.  *CBM Ex.* A at 19.  Plaintiff testified the dentist has not yet evaluated his TMJ, although they have done a number of extractions.  *Id.* at 20.  Instead, they have focused on his teeth.  *Id.* at 20-21.

---

[6] Meloxicam is to relieve pain, tenderness, swelling, and stiffness. https://medlineplus.gov/druginfo/meds/a601242.html (accessed July 14, 2016).

[7] Robaxin is a brand name for the drug methocarbamol.  It is used to "relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries."  https://medlineplus.gov/druginfo/meds/a682579.html (accessed July 14, 2016).

Plaintiff believed Dr. Saez denied him adequate treatment. *CBM Ex.* A at 116. Plaintiff notes Dr. Saez diagnosed him as not having a hernia. *Id.* at 117. The next day, however, his condition was properly diagnosed. *Id.* at 117-118. Plaintiff conceded that even if Dr. Saez had diagnosed his condition correctly, Plaintiff would not have seen a surgeon faster than he did. *Id.* at 118-119.

With respect to CBM, Plaintiff testified he did not have any grievances or disputes with it when he initially filed his lawsuit. *CBM Ex.* A at 86. Any complaints or grievances he had against CBM came up after that. *Id.* at 87. After the pain from his TMJ had gotten worse, Nurse Tyranny offered to put him on a soft diet. *Id.* at 88. At that point, Plaintiff testified he "couldn't chew, couldn't talk or nothin.'" *Id.* at 89.

Plaintiff submitted his first grievance about the diet he was receiving on December 17, 2014. *CBM Ex.* A at 89. He complained that "for the past couple of days whenever we have had potatoes there has been a lot more bad spots than not bad." *CBM Ex.* A, *Depo. Ex.* 4. The potatoes were starting to age and rot. *Id.* at 90. Lieutenant Darner indicated he would address this with kitchen staff. *Id.*

Plaintiff's next grievance was filed on January 18, 2015. *CBM Ex.* A, *Depo. Ex.* 6. Plaintiff complained that he was on a soft diet and that he could not chew the potatoes, cole slaw, or cookies. *Id.* Lieutenant Darner responded that Plaintiff should be communicating with medical staff about any medical problems he was experiencing. *Id.*

Plaintiff submitted another grievance on January 19, 2015. *CBM Ex.* A at 91. He complained that they were still receiving rotten potatoes. *CBM Ex.* A, *Depo. Ex.* 5. Lieutenant Darner indicted he would address this with kitchen staff. *Id.* at 92.

-12-

Plaintiff submitted another grievance on January 22, 2015. *CBM Ex.* A, *Depo. Ex.* 7. It said: "I am currently on a soft diet and thats not the problem the problem is the food that is on the soft diet tray is not anymore chewable than the normal food this is the problem I cant chew the soft diet because it is just as hard." *Id.* Lieutenant Heath replied: "There is nothing hard on the soft diet tray. I just spoke with the kitchen and a soft diet tray is just that, soft food." *Id.*

Plaintiff's next grievance was submitted on February 13, 2015. *CBM Ex.* A, *Depo. Ex.* 8. Plaintiff said: "I am on a soft diet as requested by medical and peanut butter is one thing it does not hurt to eat and on 12-13-2015 I was given turkey in place of peanut butter." *Id.* Lieutenant Martinez responded: "We have a dietician who handles all the diets." *Id.*

Plaintiff testified the food was simply not soft enough to "keep from having to - a lot of force to chew and the force is what was hurting my T.M.J. at the time." *CBM Ex.* A at 96-97. Plaintiff never made a request to be put on a liquid diet. *Id.* at 97.

Plaintiff believes he weighed in the 200's before he went on the soft food diet. *CBM Ex.* A at 100. Plaintiff testified he lost weight as a result of not being able to eat the soft diet. *Id.* at 100-102. When he was transferred to the ADC he weighed "190 something or maybe 180 something."

No CBM employee signed off on the grievance responses. *CBM Ex.* A at 94. Plaintiff never had any contact with any employee of CBM. *Id.* at 102. CBM was not added to the lawsuit until January 27, 2015, when Plaintiff filed an Amended Complaint. *CBM Ex.* A at 94; Doc. 9. Plaintiff testified he has no individual capacity claim against CBM. *Id.* at 103.

The menus utilized at the time of the Plaintiff's incarceration in the BCDC included a regular menu, a 2800 calorie diabetic menu, a 2500 calorie diabetic menu, and a heart healthy

-13-

menu. *CBM Ex.* B at ¶ 10.  Other special dietary needs were accommodated as ordered by medical staff and created and approved by the company dietician.  *Id.*

According to Carolyn Ellis, the regular menu included mostly soft foods.  *CBM Ex.* B at ¶ 11.  The soft diet used the same menu with substitutions for certain items, such as steamed vegetables in place of celery and carrots and potato salad or pasta salad in place of chips.  *Id.* "Food item substitutions for special dietary needs are approved by a CBM company dietitian." *CBM Ex.* C at ¶ 6.

CBM's policy was to only make changes to an individual inmate's diet pursuant to orders from medical staff.  *CBM Ex.* B at ¶ 15.  CBM staff did not regularly receive the inmate grievances submitted at the kiosk.  *Id.* at ¶ 19.  CBM and Ellis did not receive a copy of Plaintiff's grievances.  *Id.* at ¶ 20.

The only record regarding Plaintiff in the kitchen manager's file is the January 16 order for a soft diet.  *CBM Ex.* B at ¶ 18.  There were no other medical staff diet change orders in Plaintiff's file.  *Id.*.  CBM indicates Plaintiff may have occasionally received non-soft food items on his tray due to oversight in preparing his tray for that meal.  *Id.*

Plaintiff's commissary purchases included candy bars and other items that might have been harder than the items on his food tray.  *CBM Ex.* A at 104.  He testified, however, he would grind them up and put them on pastries.  *Id.* at 105.

## II.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III.  Discussion

As noted above, there are three pending motions for summary judgment.  Each motion will be addressed in turn.

### A.  Benton County Defendants' Motion for Summary Judgment

The Benton County Defendants maintain they are entitled to summary judgment for the following reasons: (a) Sheriff Cradduck, Lieutenant Martinez, and Lieutenant Devore were not personally involved in any of the conduct alleged to be unconstitutional; (b) no constitutional injury is caused by harassment and verbal abuse; (c) there is no constitutional right to a grievance procedure; (d) there were no unconstitutional conditions of confinement; (e) they are entitled to qualified immunity; and, (f) there is no basis for official capacity liability.

-15-

### 1. Supervisory Liability Claims

Plaintiff has asserted supervisory liability claims against Sheriff Cradduck, Lieutenant Martinez, and Lieutenant Devore.  A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  "The general responsibility . . . for supervising the operation of a [facility] is not sufficient to establish personal liability."  *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).  "[A] bare allegation that someone in supervisory authority has been deliberately indifferent, without any specification of that person's contact in fact with the plaintiff, [or] even an explicit charge of inadequate training or supervision of subordinates, it [not] sufficient to state a [§ 1983] claim."  *Id.*; *see also Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).

Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in "creating, applying, or interpreting a policy" that gives rise to unconstitutional conditions.  In requiring a plaintiff to allege that each defendant was personally involved in the deprivation of his constitutional rights, we assess each defendant relative to his authority over the claimed constitutional violation."  *Jackson v. Nixon*, 747 F.3d 537, 544 (8th Cir. 2014) (internal quotations marks and citations omitted).

There are no allegations that Sheriff Cradduck was personally involved in any of the alleged constitutional violations.  Plaintiff did not communicate in anyway with Sheriff Cradduck regarding his grievances or complaints about his treatment.

With respect to Lieutenant Martinez, Plaintiff indicates he was Sergeant Cogdill's supervisor and also the supervisor who could have reviewed video footage to determine the name

-16-

of the deputy involved in the use of excessive force on October 1, 2014.  There is no suggestion that Lieutenant Martinez was involved was involved in any way in the actions taken by Sergeant Cogdill and/or the John Doe Deputy.  Instead, Plaintiff makes conclusory statements that Lieutenant Martinez knew or should have known about the violations.  Such statements are insufficient to state a supervisory liability claim.  *See, e.g., Jackson v. Nixon*, 747 F.3d 537, 545 (8th Cir. 2014) ("[H]is conclusory statement that Warden Burgess 'knew or should have known' of the alleged First Amendment violation is insufficient.  Instead, Jackson must plead facts that plausibly show direct involvement by the warden in the formation, implementation, or enforcement of that policy, which at this stage of the litigation he has failed to do.").

Similarly, with respect to Lieutenant Devore, Plaintiff merely states he received the grievances about Sergeant Cogdill's behavior and forwarded them up the chain of command.  Plaintiff believes Lieutenant Devore should have taken appropriate action and reprimanded Sergeant Cogdill.  Plaintiff testified he does not know if Sergeant Cogdill was in fact reprimanded.

Plaintiff's claims against Lieutenant Martinez and Lieutenant Devore for failing to reprimand subordinate officers fail.  There is no suggestion they were involved in the alleged constitutional violations or were even aware that they had occurred until after the fact.  "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."  *White v. Holmes*,  21 F.3d 277, 280 (8th Cir. 1994); *see also Whitson v. Stone County Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted); *Keeper v. King*, 130

-17-

F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability").

To establish personal liability of a supervisory defendant, a plaintiff must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights. *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (*quoting Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)); *Keeper v. King*, 130 F.3d at 1314 (no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993) (section 1983 liability requires some personal involvement or responsibility).  No such showing has been made here.

## 2.  Verbal Harassment and Abuse

Plaintiff claims Sergeant Cogdill violated his rights when he told the Plaintiff to go "to the shower and rub one out."  While making such a statement is clearly unprofessional, it does not violate the constitution.

"Verbal threats do not constitute a constitutional violation." *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985).  Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) (inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); *Martin*, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985) (use of racially offensive language in dealing with a

-18-

prisoner does not, by itself, state a claim). *Cf. Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986) (A claim was stated where the prisoner alleged "that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death.").

### 3. Grievance Procedure

Plaintiff maintains that his grievances were not handled appropriately and the responses he received were inadequate. "Inmates do not have a constitutionally protected right to a grievance procedure. Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . . grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000) (citations omitted); *see also Lombolt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (denial of grievances does not state a substantive constitutional claim); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) ("no constitutional right was violated by the defendants' failure, if any, to process all of the grievances [Plaintiff] submitted for consideration"); *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994) (inmates have no constitutional right to grievance procedure); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000) (inmate has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." *Blagman*, 112 F. Supp. 2d at 542 (*citing Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)). A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." *Id*. (citation omitted). "[A]ny alleged due process violation arising from the alleged failure to

-19-

investigate his grievances is indisputably meritless." *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005).

Plaintiff has not identified a federal constitutional right that he was deprived of because of the alleged inadequacies in the grievance procedures.  He makes no argument that he was treated differently from other similarly situated prisoners, or that his grievances were ignored because of his exercise of his constitutional rights, or his ability to exercise any specific constitutional right was chilled by Defendants' actions.  Defendants are entitled to judgment in their favor on this claim.

### 4. Conditions of Confinement

Plaintiff maintains his constitutional rights were violated by the failure of the Defendants to maintain a clean and safe environment.  Although the inmates were given sanitizer to clean, Plaintiff maintains sanitizer was ineffective as illustrated by the fact that inmates were getting staph infection.  Further, he complained the water in the mop bucket was not changed and was used for the entire pod.

"The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996); *see also Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994) ("[I]n this circuit, the standards applied to Eighth Amendment and Fourteenth Amendment claims have been the same").  Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities.

To state an Eighth Amendment claim the plaintiff must allege that prison officials acted with "deliberate indifference" towards conditions at the prison that created a substantial risk of

-20-

serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994) (*quoting Wilson v. Sieter*, 501 U.S. 294 (1991)).

This standard involves both an objective and subjective component. The objective component requires an inmate to show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citations omitted); *see also Hudson v. McMillian*, 503 U.S. 1 (1992) (The objective component is "contextual and responsive to contemporary standards of decency.") (quotation omitted). To satisfy the subjective component, an inmate must show that prison officials had "a sufficiently culpable state of mind." *Farmer*, 511 U.S. 834 (citations omitted); *see also Brown v. Nix*, 33 F.3d 951, 954-55 (8th Cir. 1994).

Here, the inmates were supplied with sanitizer. Plaintiff did not believe the sanitizer was an effective cleaner. Inmates were also supplied comet on various days - although not on a daily basis. With respect to the dirty water in the mop bucket, Plaintiff makes no allegation that they were prevented from changing the water or that deputies refused requests to change the water. Even if they were not able to change the water, Plaintiff has not alleged the conditions were sufficiently severe so as to deprive the inmates of the minimal civilized measure of life's necessities. The conditions alleged did not deprive the Plaintiff of a single, identifiable human need such as food, warmth, or exercise. *Wilson*, 501 U.S. at 304.

-21-

### 5.  Qualified Immunity

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity.  *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### 6.  Official Capacity Liability

Defendants argue that Plaintiff has not pointed to any unconstitutional county policy or custom.  I agree.  An official capacity claim "is functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).  In other words, the official capacity claim is treated as a claim against Benton County.  *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).

"A municipality can be liable under § 1983 only if a municipal policy or custom caused a plaintiff to be deprived of a federal right." *Alexander v. Hedback*, 718 F.3d 762, 766 (8th Cir. 2013) (citations omitted).  "A governmental policy involves a deliberate choice to follow a course of action . . . made from among various alternatives by an official who has the final authority to establish governmental policy." *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007) (internal quotations and citations omitted).  A "custom involves a pattern of persistent and widespread . . . practices which become so permanent and well settled as to have the effect and force of law." *Id*.

"[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  "Moreover,

-22-

the plaintiff must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, but that the policy itself was unconstitutional." *Luckert v. Dodge County*, 684 F.3d 808, 820 (8th Cir. 2012) (internal quotation marks and citation omitted). Here, Plaintiff makes no such showing. There is no basis on which Benton County may be held liable.

### B. Medical Defendants' Motion for Summary Judgment

The Medical Defendants contend they did not exhibit deliberate indifference to the Plaintiff's serious medical needs. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). To prevail on a denial of medical care claim, the Plaintiff must show: (1) the existence of an objectively serious medical need, (2) that Defendants knew of and deliberately disregarded. *Vaughn v. Gray*, 557 F.3d 904, 908-09 (8th Cir. 2009).

It is undisputed that the Plaintiff had an objectively serious medical need. Clearly, he had conditions that caused him considerable discomfort and required treatment, specifically the inguinal hernia and the TMJ.

Instead, this case hinges on whether the Defendants exhibited the requisite mental state. Defendants' mental state must be akin to "criminal law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate . . . . Deliberate indifference must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision." *Schaub v. VonWald*, 638 F.3d 905, 914-15 (8th Cir. 2011) (internal quotation marks and citations omitted). This standard is not met by the exercise of professional judgment in refusing to implement an inmate's requested course of treatment. *Jolly v. Knudsen*, 205 F.3d 1094, 1096

-23-

(8th Cir. 2000) (constitutional violation cannot rest on mere disagreement with treatment decisions); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (inmates have no constitutional right to particular course of treatment, and doctors are free to use their own medical judgment); *Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors not deliberately indifferent where they treated the prisoner and offered sensible medication). Similarly, "[m]erely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference." *Jackson v. Buckman*, 756 F.3d 1060, 1065-66 (8th Cir. 2014) (citations omitted). To constitute deliberate indifference, "[a]n inmate must demonstrate that a prison doctor's actions were so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Id*. at 1066 (internal quotation marks and citation omitted).

In this case, Plaintiff testified he began having trouble with his inguinal hernia in August, 2014. The pain was significant enough that Plaintiff testified he was "doubled over" from the pain. Following his hernia surgery, Plaintiff states his prescription for Oxycodone was not filled, and he was instead given Ibuprofen and Acetaminophen. In response to his complaints of inadequate pain relief, Plaintiff was told the BCDC did not allow narcotic pain relievers.

Prior to his surgery, Plaintiff was only prescribed Ibuprofen or Acetaminophen. The summary judgment records contain nothing suggesting that medical staff evaluated Plaintiff's need for a stronger pain medication or tried any different medications to relieve his pain. It appears they merely followed the jail policy dictating that narcotic pain medication not be used. Neither Dr. Saez's affidavit nor Nurse Ray's affidavit indicate why they did not allow the Plaintiff to have the Oxycodone.

-24-

AO72A
(Rev. 8/82)

Plaintiff also maintains the treatment of his TMJ was insufficient. He maintains that he was in significant pain and given nothing but Ibuprofen and Acetaminophen. He also maintains he needed surgery. With respect to the provision of pain medication, once again the record contains nothing indicating the Medical Defendants evaluated the Plaintiff's pain level and determined what medication would be effective.

There appears to have been no exercise of professional judgment involved. With respect to the Oxycodone prescription, there is a question of material fact as to whether this intentional deprivation of a current prescription medication, authorized by the surgeon, constitutes deliberate indifference. *Crooks v. Nix*, 872 F.2d 800, 803 (8th Cir. 1989) (A factual dispute exists over the defendants' alleged refusal to provide adequate or proper pain medication to the plaintiff. There is no affidavit filed by any physician or medical director which contradicts plaintiff's need for pain medication); *Strahan v. Rottnek*, No. 4:13-cv-448, 2015 WL 249448, *5 (E.D. Mo. Jan. 20, 2015) (Doctor had a policy of substituting narcotic pain medication with over-the-counter medication and then applying a stepwise approach to pain medication. "Because Dr. Rottnek's policy was applied to plaintiff without any medical determination regarding plaintiff's medical need for narcotic prescription medication for his chronic pain, the policy had the effect of denying plaintiff medical treatment"); *Estate of Clutters v. Sexton*, No. 1:05-CV-223, 2007 WL 3244437, *10 (S.D. Ohio Nov. 2, 2007) (Policy prohibiting all narcotics results in a denial of medical care where there is no individual determination of the prisoner's medical need for the narcotic prescription); *cf. Prosser v. Nagaldinne*, 927 F. Supp. 2d 708 (E.D. Mo. 2013) (no deliberate indifference when physician determined inmate no longer had a need for pain medication).

-25-

Similarly, with respect to the TMJ, Plaintiff testified that he suffered from severe pain and that the Tylenol and Ibuprofen were ineffective.  Again, the record contains nothing suggesting that an independent evaluation was made whether some other type of pain medication or stronger pain medication may have been more effective.

I also believe there is a question of fact as to whether the policy is unconstitutional. "Official-capacity liability under 42 U.S.C. § 1983 occurs when a constitutional injury is caused by a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Turner v. Mull*, 784 F.3d 485, 489 (8th Cir. 2015) (internal quotation marks and citation omitted).  Plaintiff may prevail on his official-capacity claims by identifying a policy that constitutes . . . deliberate indifference." *Id*.  I believe there is a genuine issue of fact as to whether the across-the-board policy of not providing narcotic pain medication evidences deliberate indifference to the serious medical needs of the Plaintiff.

### C.  CBM's Motion for Summary Judgment

CBM argues it is entitled to summary judgment for the following reasons: (a) because of Plaintiff's failure to exhaust his administrative remedies prior to filing this lawsuit; (b) no constitutional violation exists; and, (c) there are no grounds for official capacity liability.

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), mandates exhaustion of available administrative remedies before an inmate files suit.  Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Id.* at 218 (internal quotation marks and citation omitted). The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to clam, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* "[F]ailure to exhaust available administrative remedies is an affirmative defense, not a matter of subject matter jurisdiction." *Lenz v. Wade*, 490 F.3d 991, 993 n. 2 (8th Cir. 2007).

Here, Plaintiff admits his problems with the soft diet arose after the filing of this lawsuit on November 14, 2014. *CBM Ex.* A at 86. Plaintiff, therefore, could not have exhausted his administrative remedies prior to filing this case. CBM is entitled to dismissal of the claims against it.

## IV.  Conclusion

For the reasons stated above, I recommend the following:

1. The Motion for Summary Judgment (Doc. 56) filed by the Benton County Defendants, Sheriff Cradduck, Sergeant Cogdill, Lieutenant Martinez, and Lieutenant Devore should be **GRANTED and the claims against them DISMISSED WITH PREJUDICE;**

2. The Motion for Summary Judgment (Doc. 53) filed by the Medical Defendants, Dr. Roberto Saez, Nurse Amber Goff, and Nurse Tyranny Ray, should be **DENIED**; and,

3. The Motion for Summary Judgment (Doc. 50) filed by Catering by Marlins (CBM) should be **GRANTED and the claims against it DISMISSED WITH PREJUDICE.**

-27-

AO72A
(Rev. 8/82)

The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 19th day of July, 2016.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

-28-

AO72A
(Rev. 8/82)